**DELORO SMELTING AND REFINING COMPANY, Limited, a corporation, of the Dominion of Canada, Plaintiff,**

v.

**ENGELHARD MINERALS AND CHEMICALS CORPORATION (a Delaware corporation), Defendant and Third-Party Plaintiff,**

v.

**H. KLAFF AND COMPANY, Inc. (a Maryland corporation), Third-Party Defendant.**

**Civ. No. 775-69.**

United States District Court, D. New Jersey.

June 1, 1970.

Meyner & Wiley, by William P. Verdon, Newark, N. J., for defendant and third-party plaintiff.

Van Riper, Belmont & Villanueva, by Charles E. Villanueva, Newark, N. J., Sherbow, Shea & Doyle, Baltimore, Md., of counsel, for third-party defendant.

## OPINION

COHEN, District Judge:

This challenged third-party action raises, among others, an issue requiring an interpretation of the 100-mile "bulge" or extension to the territorial jurisdiction of a federal district court under Rule 4(f) [1] of the Federal Rules of Civil Procedure. Before we dispose of these problems, brief narrative seems in order.

An examination of the pleadings, affidavits and depositions on file reveals

---

1. *Rule 4(f) "Territorial Limits of Effective Service.* All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state. In addition, persons who are brought in as parties pursuant to Rule 14 [Third-Party Practice], or as additional parties to a pending action or a counterclaim or cross-claim therein pursuant to Rule 19, *may be served in the manner stated in paragraphs (1)–(6) of subdivision (d) of this rule at all places outside the state but within the United State that are not more than 100 miles from the place in which the action is commenced, or to which it is assigned or transferred for trial;* and persons required to respond to an order of commitment for civil contempt may be served at the same places. A subpoena may be served within the territorial limits provided in Rule 45." (Italics supplied) (Brackets supplied)

The validity of this rule was sustained in Miss. Pub. Corp. v. Murphree, 326 U.S. 438, 66 S.Ct. 242, 90 L.Ed. 185 (1946) and its reasoning seems appropriate to the 1963 amendment regarding out of state service.

that about May 1, 1964 the Canadian Government was the owner of some 260,000 lbs. of refined cobalt which was in the custody and possession in Ontario, Canada, of the plaintiff, Deloro Smelting and Refining Company, Limited, a Canadian corporation, as a bailee. It is alleged that on or about May 1, 1964, and thereafter, one Leonard Vigodda, a principal of Markel Metals and Minerals, Ltd., with others, perpetrated a series of thefts of the cobalt and converted it to his own use. It is alleged further that subsequently he sold and delivered the converted metal to the third-party defendant, H. Klaff and Company, Inc., a Maryland corporation, in Baltimore, Maryland. Thereafter, between May, 1964 and January, 1965, Klaff in turn sold this same lot of stolen cobalt in Baltimore to K. Hettleman and Sons, a division of Minerals and Chemicals Phillip Corporation, located in Maryland. In 1967, Minerals and Chemicals merged into Engelhard Minerals and Chemicals Corporation, a Delaware corporation, the defendant and third-party plaintiff herein.[2]

Pending in the State of Maryland is an action by Deloro, filed May 4, 1968, against Klaff, alleging conversion of the cobalt. Subsequent to the filing of that suit, a similar action was instituted by Deloro against Engelhard in the New Jersey Superior Court, Essex County, in April, 1969 for the conversion of the same cobalt. Engelhard, being non-resident of New Jersey, removed the case to the United States District Court in Newark and then moved to have the cause of action reallocated to Camden, so that Klaff in Baltimore could be brought in as a third-party defendant. Deloro bases its action against Engelhard on the theory that Engelhard succeeded to the rights and assumed the liabilities and responsibilities of the merged corporation, Minerals and Chemicals, one of which was for the alleged conversion of the stolen cobalt. Accordingly, Engelhard alleging a good faith purchase from its seller, Klaff, sought to join it as a third-party defendant. The motion was granted, process issued and was served by a United States marshal upon Klaff's comptroller at its principal place of business in Baltimore, Maryland, on December 3, 1969, pursuant to Rule 4(f), F.R. Civ.P. (See Note 1 ante).

Klaff filed the present motion to dismiss the third-party complaint, or to quash the personal service of process, on the ground that its place of business was beyond the 100-mile extension of territorial jurisdiction from the Federal Courthouse in Camden. Thereafter, as a precaution, Engelhard delivered to the United States Marshal's Office, a copy of the third-party summons and complaint for service upon Klaff at its principal place of business in Baltimore, by *certified mail*, pursuant to Rule 4(e), F.R. Civ.P., providing for such service of process by use of New Jersey Revised Rule 4:4–4(d) [now R. 4:4–4(c)(1)],[3] the so-called "long arm" provision

---

2. All the parties are dealers, brokers and processors of metal materials.

3. *Rule 4(e)* [Summons]: *"Service Upon Party Not Inhabitant of or Found Within State.* Whenever a statute of the United States or an order of court thereunder provides for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order, or, if there is no provision therein prescribing the manner of service, in a manner stated in this rule. Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state, or (2) for service upon or notice to him to appear and respond or defend in an action by reason of the attachment or garnishment or similar seizure of his property located within the state, service may in either case be made under the circumstances and in the manner prescribed in the statute or rule."

*New Jersey Revised Rule 4:4–4(d), Civil Pract. and Proced.* provides in pertinent part: "Upon a domestic or foreign corporation, * * * if service

of the rules. Klaff acknowledged receipt of the process on March 30, 1970. It should be observed that under both Federal and New Jersey Rules, this latter method of service cannot be utilized unless all other means fail; provided, however, that the requirements of federal due process are observed. This additional attempt to effect service of process upon the foreign corporation enables this Court to determine the validity of both methods employed upon the one motion challenging the complaint in the third-party action.

In regard to the first method of service or process under Rule 4(f), involving construction of the 100-mile extra-territorial "bulge" of judicial jurisdiction, research has revealed no reported case providing a yardstick by which this distance is to be measured. The second method, under Rule 4(e) providing for service by mail upon a foreign corporation, raises an issue as to whether there are "sufficient minimal corporate contacts" with the State of New Jersey within due process of law, so as to subject such corporation to judicial jurisdiction here.

Klaff contends that its place of business, by use of the "ordinary, usual and shortest route of public travel," is situated more than 100 miles from this forum. This contention is supported by various affidavits[4] executed by official representatives of car, rail and air transportation companies, and also by a private investigator. A combination of any of these media shows a range of 102.8 to 115 miles from Klaff's office to this

forum. The range will vary, of course, depending upon the termini points, i. e., railroad station to railroad station, airport to airport, center city to center city, state border to state border, or courthouse to courthouse, or courthouse to place of service.

The position of Engelhard is that the measurement of distance to be employed, in giving realistic effect to Rule 4(f), is by use of the straight-line, i. e., "as the crow flies" test. In utilizing this construction, Klaff is within the 100-mile radius of this forum and subject to *in personam* process as a third-party defendant.

Engelhard claims that by employment of a Bates National Ruler calibrated to $\frac{1}{16}$ of an inch upon the official map of Rand McNally Road Atlas, 1969, the distance from Baltimore to Camden has been computed to be 91 miles, more or less. Engelhard's approximation of road mileage between downtown Baltimore and downtown Camden, as calculated by the Motor Club of America, is 102–105 miles, pointing up the closeness to the 100-mile limit.

In considering the first issue, the 100-mile "bulge" of federal jurisdictional reach of process, we are confronted with a choice between two possible yardsticks with which to measure the distance: (1) the "ordinary, usual and shortest route of public travel" to the forum, or (2) the straight-line "as the crow flies" method.

The purpose of the so-called "bulge" provision in the federal rules is spelled

cannot be made upon any of the foregoing and the corporation is a foreign corporation, then, subject to due process of law, by mailing, registered mail return receipt

requested, a copy of the summons and complaint to a registered agent for service, or to its principal place of business, or to its registered office."

4.

| | |
|---|---|
| Auto—Center City Camden to Center City Baltimore | 105 miles |
| Auto—Center City Camden to Center City Baltimore— another route | 113 " |
| Train—Balt. R.R. Station to Phila. R.R. Station | 95.1 " |
| Plant—Balt. Intl. Airport to Phila. Intl. Airport | 95.05 " |
| Subway—Phila. R.R. Station (30th St.) to Federal Courthouse | 4.5 " |
| Auto—Phila. R.R. Station (30th St.) to Federal Courthouse | 5.1 " |
| Auto—Phila. Intl. Airport to Federal Courthouse | 13.8 " |
| Auto—Balt. R.R. Station to Klaff's office | 3.2 " |

out in the Comments of the Advisory Committee on Rules, 3A Barron & Holtzoff, Fed.Pract. & Proced. (1969 Supp. p. 235):

"The bringing in of parties under the 100-mile provision in the limited situations enumerated *is designed to promote the objective of enabling the court to determine entire controversies.* In the light of present-day facilities for communication and travel, the territorial range of the service allowed, analogous to that which applies to the service of a subpoena under Rule 45(e) (1), can hardly work hardship on the parties summoned. The provision will be especially useful in metropolitan areas spanning more than one State." (Italics supplied.)

██ Cognizant of the fact that in subpoena situations under Rule 45(e) (1), the "ordinary, usual and shortest route" has been utilized by the courts, nevertheless, we are of the view that the straight-line, or the "as the crow flies" test seems to be the more realistic choice. Where, as here, the question of distance is a close one, the "ordinary, usual and shortest" method is troublesome. In this era of mobility, what may be shortest may not necessarily be ordinary or usual. Modes of transportation, choices of routes, traffic congestion, road construction, detours, weather conditions, rerouting of air traffic are a few of the daily problems presenting too many variables and imponderables. And who is to be the final arbiter? Adoption of the "as the crow flies" method, calculated simply by use of a map and a ruler, would avoid these myriad problems. Axiomatically, the arithmetical straight-line is the shortest distance between two points. Judicial notice may be taken of the distance between two cities. Munson S. S. Lines v. Newman, 24 F.2d 416 (5 Cir. 1928). *Cf.:* Merchant Bank of N. Y. v. Grove Silk Co., 11 F.R.D. 439 (M.D.Pa.1951) which, under Rule 45 F.R.Civ.P., adopted the "ordinary usual and shortest route of public travel and not [the] mathematically straight line between the place of service and the

place of trial." This rule seems to be bottomed upon the convenience of *witnesses.* While convenience of parties, witnesses and counsel is always of concern, such can hardly be contrasted to a judicial concern under Rule 4(f) with the extraterritorial reach of the judicial jurisdiction *in personam* over parties upon whom judgment is to be imposed. In any event, witnesses beyond the reach of a subpoena can always be deposed. It seems to us that the test is "reasonableness" in light of the objective to be achieved, in one instance—the convenience of witnesses and in the other—the extraterritorial reach of judicial jurisdiction over a party, consistent with the requirements of due process of law. International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); L.D. Reeder Contractors of Ariz. v. Higgins Industries, 265 F.2d 768 (9 Cir. 1959).

Such an outstanding authority as Professor Moore champions the "as the crow flies" method, saying:

"While the wording does not make clear how the distance of 100 miles is to be calculated in close cases, since the purpose of this provision is *mildly* to extend the territorial limits of effective service of the federal courts *to facilitate determining whole controversies,* the method of calculation which would lend itself to this objective should be followed. *Thus such service should be allowed any place within the United States which is within a radius of 100 miles 'as the crow flies' from the federal court in which the action is pending."* 2 Moore's Federal Practice ¶ 4.42[2], p. 1293.32 (1967). (Emphasis supplied.)

This view is shared by Professors Wright and Miller in their new and excellent work on Federal Practice and Procedure, wherein it is stated:

"It is not clear whether '100 miles' means 100 miles from the place of trial by the ordinary surface means of travel or by direct air miles. The 1963 Advisory Committee Note simply

indicates that the provision is analogous to that for service of a subpoena under Rule 45(e) (1). The cases under the latter rule and earlier provisions show a preference for using 'the ordinary, usual and shortest route of public travel.' (citing cases.) *This is unfortunate because the simplest method is to measure distances in a straight line so that the area in which service can be made is indicated by a circle with the place of trial as its center and the 100 miles represented as the circle's radius.* Moreover, measuring the area in this manner has the advantage of eliminating controversy as to what is the ordinary means of public travel and the usual route to the place of service." (Emphasis supplied.) 4 Wright & Miller, Fed.Pract. & Proced.Civil § 1127 p. 531 n. 22 (1969).

We conclude that the more certain mathematical "as the crow flies"— straight-line choice of measurement seems the more logical one for the computation of distance under Rule 4(f), thus we determine that Klaff in Baltimore is within 100 miles of the federal forum in Camden. See Merchant Bank of New York, supra. Therefore, the motion to dismiss the third-party complaint, or to quash the *in personam* service of process under Rule 4(f), will be denied.

Ordinarily, we would need go no further. However, in light of the novelty of the Rule 4(f) issue, we deem it expedient to reach and dispose of the companion thrust of Klaff's motion challenging service of process by certified mail. On this issue Engelhard argues that jurisdiction was secured over Klaff on the "minimal corporate contacts" theory pursuant to Rule 4(e) F.R.Civ.P., which incorporates New Jersey R.R. 4:4–4(d). (See note 3, ante.)

█ Engelhard concedes that the corporate contacts upon which it relies to subject Klaff to jurisdiction here under Rule 4(e) are *unrelated* to the cause of action. (This concession is necessitated by the undisputed facts that both the complaints of Deloro and Engelhard relate to an alleged theft in Ontario, Canada, and a subsequent purchase and resale in Baltimore.) Nevertheless, Engelhard maintains that Klaff's business is national in scope with substantial intrusions into New Jersey warranting jurisdiction over it in this Court. In addition to New Jersey, its business penetrates some 30 other states. We quite agree that corporate contacts need not be related to the cause of action sued upon. Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). But then the question remains, did Klaff in fact have sufficient substantial contacts with New Jersey to subject it to jurisdiction here? As stated in *Perkins,* when the activity of the corporation is not related to the forum state:

"It remains only to consider, in more detail, the issue of whether, as a matter of federal due process, the business done in [the state of New Jersey] by the respondent * * * company was sufficiently substantial and of such a nature as to *permit* [the forum state] to entertain a cause of action against a foreign corporation, where the cause of action arose from activities entirely distinct from its activities in [the forum state]. 342 U.S. 447, 72 S.Ct. 419. (Italics in opinion; brackets supplied.)

Engelhard argues that although Klaff has no corporate certificate of authority to do business in New Jersey, has no office or salesmen or representatives here, nonetheless, its extensive business by telephone and mail solicitation, both national and direct, of customers does substantially penetrate this state, thus subjecting it to suit here. Significantly, claims Engelhard, during 1964–1969, 25% of its sales and 70% of its purchases were consummated outside of Maryland. Of this business some 7 million dollars of sales and purchases were generated from customers within New Jersey. In short, Engelhard argues that these contacts are continuous, systematic and of a substantial nature suf-

ficient to subject Klaff to jurisdiction here and it relies upon the Restatement of Law, 2d, Conflict of Laws § 47; Corporate Dev. Spe. Inc. v. Warren-Teed Pharm. Inc., 102 N.J.Super. 143, 245 A.2d 517 (App.Div.1968); Perkins v. Benguet Consolidated Mining Co., supra; Donley v. Whirlpool Corporation, 234 F. Supp. 869 (E.D.Mich.1964); and Gordon v. International Tel. & Tel., 273 F.Supp. 164 (N.D.Ill.1967).

■■ Disputing the significance attributed to its activities by Engelhard, Klaff maintains that its entire facilities are located in Baltimore; that it has been a Maryland corporation since 1923; that it does not, nor has it any authority to, do business in New Jersey; that it does not own, lease or rent any property here; it maintains no office, warehouse, terminal, other building, or telephone listings here; that none of its officers, employees or agents resides here; that it maintains no bank accounts or corporate records here; it employs no salesmen or representatives here; it has no proprietary interests here; it has never advertised by radio, television or magazine here, except in national trade papers and magazines; that none of its trucks owned or leased made or make any deliveries here; and that, other than the present action, it has never been a party to any litigation in New Jersey. It admits that it operates on a "national" scale and that it did so during the six-year period 1964–1969.[5] In 1969, its gross sales totaled over $30,000,000 of which $2,000,000 were made to New Jersey customers, and its gross purchases totaled over $27,000,000, of which $5,000,000 was made by it from New Jersey customers. However, all sales including those to New Jersey customers were closed "F.O.B. Baltimore." In 1969, sales were made to only four New Jersey customers, all "F.O.B. Baltimore"; and

there were purchases by Klaff from thirteen New Jersey sellers all but two of which were "F.O.B. Baltimore," representing .0002% of its 1969 purchases, or less than 1/50th of 1%. Much is made by Engelhard of the gross dollar volume of Klaff's business and its ratio to New Jersey customers over a 6-year period. It claims this constitutes a substantial commercial penetration into New Jersey, thus subjecting it to jurisdiction here. This argument overlooks the fact that, while some of Klaff's many customers throughout the United States were resident in New Jersey and contributed to a significant portion of its gross business over a 6-year period, all of Klaff's business, except perhaps a comparatively *de minimis* portion, was purposefully conducted and concluded in Baltimore, not in New Jersey. Simply because it may have grossed millions of dollars worth of business in the State of Maryland, of which several millions may have come from or have been paid to New Jersey customers for *business in Baltimore*, such does not subject it to jurisdiction in New Jersey. The ratio of dollar value or even the total dollar volume is irrelevant, so long as the business is in fact, or a substantial portion of it, not done in New Jersey as we find to be the case here. In summary, Klaff insists that all of its business is transacted *solely* in Maryland; that it employs no salesmen or representatives anywhere; that it functions by telephone solicitation of customers for either the sale or purchase of metals, followed by mail regarding specifics of a particular transaction and finalized by shipments in the use of sales, and receipts in the case of purchases, "F.O.B. Baltimore." Klaff insists that because its customers are spread throughout the nation, this does not necessarily subject it to a "national jurisdiction" as contended by Engelhard. We quite

---

5. Sales to New Jersey purchasers during 1964–1969: 1964—$68,902.24; 1965—$67,180.73; 1966—None; 1967—$130,809.72; 1968—$1,145,929.42 and 1969—$636,247.45, all sales "F.O.B. Baltimore." Purchases from New Jersey sellers during 1964–1969: 1964—$295,995.96; 1965—$611,833.84; 1966—$819,168.49; 1967—$543,351.00; 1968—$1,029,675.00; 1969—$1,906,373.00. (Klaff, Supplemental Affidavit, Exhibits A, B, C, and D attached thereto.)

agree. The expansion of *in personam* jurisdiction throughout the states does not suggest a *national* jurisdiction in diversity cases. The law is definitely to the contrary. As stated in the leading case of Hanson v. Denckla, 357 U.S. 235, at page 251, 78 S.Ct. 1228, at page 1238, 2 L.Ed.2d 1283 (1958):

" * * * [I]t is a mistake to assume that this trend [retreat from the rigid rule of Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, to, the flexible standard of International Shoe Co. v. Washington] heralds the eventual demise of all restrictions on the personal jurisdiction of state courts [or federal courts in diversity cases]. See Vanderbilt v. Vanderbilt, 354 U.S. 416, 418 [77 S.Ct. 1360, 1362, 1 L.Ed.2d 1456]. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him." (Brackets supplied)

Due process of law requires that the foreign corporation have sufficient substantial contacts with the forum state exercising jurisdiction, so as not to offend "traditional notions of fair play and substantial justice." *International Shoe Co.*, supra; Dragor Shipping Corp. v. Union Tank Car Co., 361 F.2d 43 (9 Cir. 1966), cert. den. 385 U.S. 831, 87 S.Ct. 68, 17 L.Ed.2d 66 (1966). The key to the exercise of judicial power over a foreign corporation seems to be a judicial conclusion that such corporation by its conduct subjected itself to jurisdiction by purposefully availing itself of the benefits and protections of the laws of the forum state. In examining the corporate business activities of Klaff, we fail to find "minimal contacts" prerequisite to its subjection to the jurisdiction of this Court under Rule 4(e). There is nothing in this record which indicates any conduct of Klaff from which it might reasonably be inferred that it sought the benefits or protections of the laws of New Jersey. As stated by our Court of Appeals in Scheidt v. Young, 389 F.2d 58, 60 (3 Cir. 1968), telephone and mail solicitations of New Jersey customers are but " * * peripheral occurrences and do not constitute 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " We conclude that the assumption and exercise of judicial jurisdiction pursuant to Rule 4(e), under the circumstances of this case, would not be consonant with the constitutional criteria of due process requiring fair play, reasonableness and substantial justice. The authorities cited by Engelhard in support of its proposition to the contrary are inapposite to the circumstances here, in view of the lack of minimal corporate contacts in New Jersey.

In accordance with the foregoing, the Rule 4(f) phase of the motion to quash *in personam* service of process will be denied; and the Rule 4(e) phase of the motion to quash service will be granted. Therefore, the third-party complaint is sustained and further pleading shall proceed.

Counsel for Engelhard may submit an appropriate order which shall, as requested for both parties, provide that this ruling is final pursuant to Rule 54 (b) F.R.Civ.P.